# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MARTIN J. GILLAN, IV,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action 04-00311  (HHK)** |
| **GORDON R. ENGLAND,**<br>**Secretary of the Navy,** | |
| **Defendant.** | |

## MEMORANDUM OPINION

Plaintiff, Martin J. Gillan IV ("Gillan"), seeks review of a final decision of the Board for the Correction of Naval Records ("The Board") that declined to set aside his two non-selections for promotion while he was in the Navy Reserve.  Gillan brings this action against the Secretary of the Navy ("Navy"), in his official capacity, pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq*., ("APA").[1]  Presently before the court are the Navy's motion to dismiss or, in the alternative, for summary judgment, and Gillan's cross-motion for summary judgment.[2]  Upon consideration of the motions, the oppositions thereto, and the record of this case, the court concludes that the Navy's motion for summary judgment must be granted.

---

[1] Judicial review of final agency actions is provided by 5 U.S.C. § 706(2)(A): The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions of law found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  The parties do not dispute that the Board's decision constitutes a final agency action.

[2] "Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record even though the court does not employ the standard of review set forth in Rule 56, Fed. R. Civ. P."  *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995) (internal citation omitted).

## I. BACKGROUND

Gillan enlisted in the military as a member of the United States Coast Guard in 1978.   He

transferred to the Naval Ready Reserve in 1987, where he was a member of the Selected

Reserve.[3]   In December 1990, Gillan's squadron was mobilized to active duty in Operation

Desert Storm, during which time he flew logistics missions to Bahrain and the Kuwaiti border.[4]

Upon completing his active duty in May 1991, Gillan requested, and was granted, permission to

transfer from the Selected Reserve to the Individual Ready Reserve ("IRR").[5]   From 1991 to

1997, "for pressing family and personal reasons," Gillan was unable to fulfill his required duty in

the Naval Reserves and failed to "achieve the points needed for satisfactory participation."[6]

---

[3]     The Naval Reserve is composed of three categories: Ready Reserve, Standby Reserve, and Retired Reserve. Def's. Ex. C at 1-1 (Bureau of Navy Personnel Instruction ("BUPERINST") 1001.39A § 2102, "Administrative Procedures for Naval Reservists on Inactive Duty."). The Ready Reserve is further subdivided into the Selected Reserve and the Individual Ready Reserve. *Id.* at 1-2. All members of both the Selected Reserve and the Individual Ready Reserve are considered to be in "active" status. *Id.* Prior to and during his service in Desert Storm, Gillan was a member of the Selected Reserve. Upon his return, he transferred to the Individual Ready Reserve. Compl. ¶ 14.

[4]     Active duty is defined as "full-time duty in the active military service of the United States." Def's. Ex. D at 4 (Department of the Navy Instruction ("SECNAVINST") 1920.6A). Active status is defined as "[a] Reserve commissioned or warrant officer, who is a member of the Ready Reserve or Standby Reserve-Active, including Reserve offices on the active-duty list." *Id.* Members of the Ready Reserve always have active status, but are not necessarily on active duty. Def's. Ex. C at 1-1 (BUPERINST 1001.39).

[5]     The primary difference between the Selected Reserve and the IRR is that members assigned with drill pay are in the Selected Reserve, whereas members assigned non-pay, who either drill in a Voluntary Training Unit or do not drill, are in the IRR. Def's. Ex. C at 1-2 (BUPERINST 1001.39). Members of both, however, are considered to be in active status and may continue to earn retirement points and remain eligible for promotions. *Id.* at 1-15.

[6]     Naval reservists earn credit for their service toward a pension.  Eligible years credited toward a valid retirement are accrued when the reservist earns at least fifty points during the course of the year. *See* 10 U.S.C. § 12732.

Compl. ¶ 15.  Nevertheless, Gillan remained in the IRR until 1995, and during that time was twice passed over for a promotion.  Due to his failure to earn sufficient points to remain in the IRR, the Mobilization Disposition Board ("MDB") screened and transferred Gillan to inactive status in 1995.

Gillan contacted the Navy in 1995 and 1996 about resuming his career in the Naval Reserve and, in 1997, joined a Voluntary Training Unit.  After five months, however, he was told that he could no longer participate because he had been twice passed over for a promotion and had twenty years of commissioned service, which by statute required his name to be removed from the active-status list.  In 1999, Gillan filed a petition with the Board asking that it set aside his two failures to be promoted.  The Board denied this petition, along with three subsequent petitions.[7]   Gillan now seeks relief from this court.

## II. ANALYSIS

Each party's position and arguments in support thereof are straight forward. The Navy asserts that after Gillan returned from serving in Desert Storm in 1991, he transferred to the IRR, where he remained eligible for promotions.  Though he did not drill, earn points, or otherwise maintain any level of activity in the Navy Reserve, his name properly came up for promotion in 1994 and 1995 because he was still in the IRR.  That Gillan was screened and transferred to inactive status in 1995 does not change the fact that he was both eligible and

---

[7]     Plaintiff first filed a petition with the Board in 1999, and that petition was denied because the Board found no error or injustice. A.R. 276.  Gillan twice requested reconsideration of this decision, once in 2001 and once in 2002, but the Board denied both requests because he had not presented any new material evidence not previously considered by the Board.  A.R. 628, 657–658.  In 2003, a new Board convened to reconsider Gillan's petition, and a panel of the Board's voting members again denied his request.  A.R. 611.

properly passed over for promotions at the times the selection for promotion decisions were made. Accordingly, it was not arbitrary and capricious for the Board to refuse to set aside Gillan's failures to be promoted.

For his part, Gillan does not dispute that he failed to fulfill his duties in the reserves from 1991 to 1997. Indeed, Gillan argues, this is why he should not have been considered for promotion. According to Gillan, the Navy was, by statute and regulation, required to transfer him to inactive status after one year of inactivity, and had it done so, he would not have failed to be promoted because he would not even have been considered for a promotion. Gillan further argues that even if he was properly considered for a promotion, the Board based its decision not to promote him on an inaccurate fitness report, which he now also seeks to amend.[8]

The parties' arguments will be considered in turn.

*1. Wrongful Consideration for Promotion*

Gillan argues that the Navy violated statutory and regulatory directives when it failed to annually screen him and transfer him to inactive status in 1992, 1993, and 1994. But for these violations, he would not have been considered for promotion those years. Gillan cites 10 U.S.C. § 10149(a), and military regulations, as the origin of the Navy's obligation to screen him annually. 10 U.S.C. § 10149(a) states, in pertinent part, that the Secretary of the Navy "shall

---

[8] The Navy's motion to dismiss both claims must be denied at the outset. A complaint may not be dismissed pursuant to Federal Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957). In his complaint, Gillan alleges that the Board's decision not to set aside his failures to be promoted "was arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, and contrary to law" because the Navy violated statutory and regulatory directives and because it considered an inaccurate fitness report. Compl. ¶¶ 37–40. Considering the facts in a light most favorable to Gillan, as we must, Gillan has successfully stated a claim upon which relief may be granted.

provide a system of continuous screening of units and members of the Ready Reserve."  In order

to carry out the directives of this statute, the Secretary of Defense promulgated a regulation

mandating that members of the Ready Reserve "shall be screened . . . at least annually."  Def's.

Ex. E (Department of Defense Directive ("Dodd") 1200.7 § 4.1, "Screening the Ready

Reserve.").  The Secretary of the Navy, in turn, issued an implementing regulation mandating

that the Navy "shall screen at least annually" members of the Ready Reserve.  Def's. Ex. F

(SECNAVINST 1001.10F, "Screening the Ready Reserve.").  Finally, the Chief of Naval

Personnel provided further guidance—"[a]ll members of the Ready Reserve who are not on

active duty will be screened at least annually."  Def's. Ex. C (BUPERINST 1001.39A § 2102,

"Administrative Procedures for Naval Reservists on Inactive Duty.").

Taken together, there is little question that these directives conferred upon the Navy a

duty to conduct annual screening of reservists.  The time limits set forth in DoDD 1200.7,

SECNAVINST 1001.10F, and BUPERINST 1001.39A § 2102 are consistent—each reservist

not on active duty shall be screened at least once per year.  As Gillan correctly argues, the Navy

is bound, as are all military departments and agencies, to follow its own regulations.  *See*

*Service v. Dulles,* 354 U.S. 363, 388 (1957); *Frizelle v. Slater*, 111 F.3d 172, 177 (D.C. Cir.

1997).  In this instance, the Navy failed to abide by the governing regulations.  Despite the fact

that Gillan's participation in the Naval reserves had fallen below the required levels in 1992,

1993, and 1994, he was not placed before an MDB until 1995.

It is not solely the Navy's failure to screen him, however, that Gillan argues led to his two failed promotions. It is the Navy's failure to screen *and transfer* him to inactive status.[9] The question, then, is whether the Navy was required to alter Gillan's reserve status within a delineated period of time.

The requirement that screening of reservists occur annually is unambiguous. By comparison, any limitation on the transfer of reservists who fail to achieve the minimal level of participation is not. 10 U.S.C. § 10149(b) offers limited guidance:

> Under the regulations to be prescribed by the Secretary of Defense . . . , a member of the Ready Reserve who is designated as a member not to be retained in the Ready Reserve as a result of screening under subsection (a) *shall, as appropriate,* be—(1) transferred to the Standby Reserve; (2) discharged; or (3) if the member is eligible and applies therefor, transferred to the Retired Reserve.

10 U.S.C. § 10149(b) (emphasis added).[10] Gillan asserts that the use of the mandatory term "shall" indicates that the transfer is non-discretionary, and therefore must occur immediately after a reservist is deemed to have failed to meet the points-requirement. The Navy counters

---

[9] Demonstrating that Gillan should have been screened annually, without more, does not prove Gillan's claim that he was improperly considered for promotion in 1994 and 1995. Because the court views the annual screening requirement as a technical, rather than substantive requirement, Gillan must be able to demonstrate some prejudice from the Navy's procedural oversight. *See Neal v. Sec'y of the Navy*, 639 F.2d 1029, 1035 (3d Cir. 1981). The Navy's failure to annually screen Gillan is sufficiently attenuated from his failed promotions that, in the absence of a separate obligation to transfer Gillan to inactive status, Gillan will be unable to "provide evidence of a nexus or link between the error or injustice and the adverse action." *See Wotowic-McGill v. United States*, 42 Fed. Cl. 318, 323 (Fed. Cl. 1998) (citing *Hary v. United States*, 618 F.2d 704, 706–07 (Cl.Ct. 1980)).

[10] 10 U.S.C. § 12642(b) states similarly "[A] reserve commissioned officer who fails to attain the number of points, or to conform to the standards and qualifications, prescribed in subsection (a) shall—(1) be transferred to the Retired Reserve if he is qualified and applies therefor; (2) if he is not qualified or does not apply for transfer to the Retired Reserve, be transferred to an inactive status, if he is qualified therefor; or (3) if he is not transferred to the Retired Reserve or an inactive status, be discharged from his reserve appointment."

that though the term "shall" is used, no explicit time to effectuate the transfer is included within the statute. Therefor, the appropriate manner and timing of any transfer is left to the discretion of the Navy.[11]

The court finds merit to the Navy's argument. 10 U.S.C. § 10149(b) and 10 U.S.C. § 12642(b) contemplate that the Navy be afforded at least some discretion with respect to the transfer of members of the reserve. When the Navy identifies a reservist who fails to meet the minimum requirements to remain in active status, the Navy must select from three available options: (1) transfer to the Retired Reserve, (2) transfer to inactive status, or (3) discharge from the individual's reserve appointment. A plain-reading of the statutes indicates that the decision as to which of these three options is chosen is left to the expertise of the Navy.[12] Gillan does not argue that once a reservist has been screened and classified as a non-performing reserve officer, the officer's transfer to inactive status occurs by operation of law. Accordingly, at least some

---

[11] The Navy notes that though the applicable statute utilizes the term "shall," the Naval regulation adopted to implement 10 U.S.C. § 12642 states that the "[r]easons BUPERS . . . *may* transfer Reserve members to the USNR-S2 include: . . . (b) Failure to satisfy minimum participation requirements per section 104." BUPERINST 1001.30A § 103. The Navy cites this regulation as support for the proposition that "[a]s a matter of discretion, the transfer may occur, not on a timetable, but only after due consideration by military authorities designated by the Secretary and after due process afforded to the affected reservist under the applicable agency regulation." Def. Mot. at 13. The court does not believe that this is a fair reading of the regulation, and one that could bring the regulation into conflict with the enabling statute. The court believes that the use of the word "may" suggests that there are a variety of appropriate grounds upon which a reservist might be transferred to USNR-S2 (inactive) status, one of which may be failure to satisfy the minimum participation requirements.

[12] In the instant case, Gillan acknowledges that once he was screened, the Navy had the option of either transferring him to inactive status, or discharging him.

amount of time must elapse between when an under-performing reservist is identified, and when transfer or discharge of that reservist occurs.  The Navy must be afforded time to evaluate which of the aforementioned options is most suitable to the needs of the Navy.

Furthermore, when the statutes and regulations governing the screening of reservists are juxtaposed with those controlling transfer, it becomes evident that had Congress, the Department of Defense, or the Navy wished to institute a time period by which non-participating reservists were required to be transferred to inactive status, they were more than capable of formulating such a limitation.  *C.f. California Metro Mobile Commc'ns, Inc. v. Fed. Commc'ns Comm'n*, 365 F.3d 38, 45 (D.C. Cir 2004) (construing the Communications Act, and holding "[t]hat the Congress took care to specify in section 312 the circumstances following the grant of a license that warrant its revocation tends to show that if the Congress was focused on post-grant events, it mentioned them.  The Congress did not do so in section 316, which fact tends to bolster, if only slightly, the conclusion that section 316 is not limited to circumstances occurring after the license grant.), *Sierra Club v. Thomas*, 828 F.2d 783, 797 n.99 (D.C. Cir. 1987) ("Because the Act imposed deadlines in some areas, we must conclude that Congress' failure to impose deadlines elsewhere was not inadvertent.").  That Gillan is incapable of citing any explicit deadline for transfer, but instead must infer one from the screening regulations, supports the court's conclusion that no such limitation was envisioned by Congress, the Department of Defense, or the Navy.

Further, the court declines the invitation to create a time limitation where none already exists.  In the absence of clear Congressional or agency directives, courts are reluctant to impose upon agencies an obligation to perform activities within a specified time period.  *See generally*

8

*Heckler v. Day*, 467 U.S. 104, 118–19 (1984) (rejecting judicially imposed 90-day mandatory deadline for scheduling an agency hearing following the filing of a request); *Sierra Club v. Gorsuch*, 715 F.2d 653, 658 (D.C. Cir 1983) ("absent a precise statutory timetable or other factors counseling expeditious action, an agency's control over the timetable of a rulemaking proceeding is entitled to considerable deference"); *Cutler v. Hayes*, 818 F.2d 879, 897 n.158 (D.C. Cir. 1987) (recognizing "stern counsel . . . against judicial imposition of mandatory deadlines . . ."). To judicially impose a deadline in the instant case would intrude upon the Navy's ability to allocate resources as it sees fit, and control the manner in which it administers personnel decisions. Furthermore, the Navy provides a compelling reason for permitting at least some delay in the transfer to inactive status of reservists identified as having less than the necessary level of participation. Because a transfer from the IRR to the Standby Reserve (as well as discharge from the Reserves), entails a loss of benefits, reservists are provided notice of the pending change in status so as to afford them an opportunity to contest their transfer.[13] Without the allowance of some time between identification and transfer, reservists would risk an immediate loss of benefits with limited procedural safeguards.

---

[13] In a memorandum recommending the denial of Gillan's petition, the Navy noted that SECNAVINST 1920.6A "specifically required a lengthy due process to effect a removal of an officer from Ready Reserve status. In 1999 . . . SECNAV simplified that process considerably. But at the time in question, the process to transfer someone from the Ready Reserve required identification, notification, response time for a reply, removal from the list for a reply requesting continued participation, compiling a final list of those who did not respond to go before the next scheduled Mobilization Disposition Board authorized by SECNAV, and approval of the Board results by SECNAV." R. 247.

Gillan urges the court to draw an adverse inference from the Navy's decision to revise the transfer process, however the court believes such an inference is unsupported by the record. Indeed, the Navy's decision to modify its transfer process, presumably after careful analysis, lends support for the argument that the structure of personnel transfers benefits from Naval expertise.

9

The court is particularly wary of dictating to the military the manner in which personnel decisions should be made.  Gillan's protestations to the contrary, the Navy's choice concerning the process and timing of an underperforming reservist's transfer deserves a degree of deference. *See, e.g. Dilley v. Alexander*, 603 F.2d 914, 919–20 (D.C. Cir. 1979) ("Recognizing that it is not the business of the courts to run the military establishments, courts have shown extreme reluctance to interfere with the military's lawful exercise of its discretion over internal management matters.").  The process by which a transfer from the Ready Reserve occurs is informed by the Navy's expertise, and is not simply a ministerial activity.  Though the court acknowledges that less deference is appropriate where a violation of the Constitution, statutes, or regulations is alleged, *see Harmon v. Bruker*, 355 U.S. 579, 582 (1958); *Dilley*, 603 F.2d at 920, the instant case does not present an instance in which a clear regulatory violation resulted in injury.  Because the Navy was under no obligation to transfer Gillan before it did, the Board's decision that Gillan was properly considered for, and denied, promotion was not arbitrary and capricious.

### 2. Correction of Gillan's 1990 Fitness Report

Gillan also argues that the Board acted arbitrarily and capriciously when it failed to change a grade on his 1990 fitness report which, according to a letter filed by his commanding officer in 1998, should have been raised from a "B" to an "A."  A.R. 288.

Pursuant to 10 U.S.C. § 1552(a)(1), "The Secretary of a military department may correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error or remove an injustice."  The statute further states "[c]orrections under this

section shall be made under procedures established by the Secretary concerned."[14]  10 U.S.C. §

1552(a)(3).  In accordance with 10 U.S.C. § 1552(a), the procedures established by the Navy

dictate that "The reporting senior can, for good cause, submit administrative changes or

evaluative supplements within 2 years from the ending date of a report."  BUPERINST 1610.10,

Enclosure 1, ¶ 14.  In addition:

> Supplementary material submitted more than 2 years after the report ending date .
> . . will be accepted only if the reporting senior demonstrates in a cover letter, to
> CHNAVPERS satisfaction, why the material could not have been submitted in a
> more timely manner.  Reconsideration by the reporting senior, or a member's
> failure of selection, will not justify late submission of supplementary material.
> There must have been circumstances beyond the reporting senior's control."

*Id.* at Annex P, ¶ P-4(c).  The regulation goes on to state that reservists "have the right to submit

statements to the record concerning their reports, either at the time of the report or within 2

years thereafter," and also that reservists have "the responsibility to ensure that their records are

complete."  *Id.* at Enclosure 1 ¶15.

In September 1990, Gillan received a fitness report from his commanding officer,

Captain Stanley Jorgensen, evaluating his performance from January 20, 1990, to September 30,

1990.  A.R. 472.  The report gave Gillan a grade of "B" in the category of "Desirability,"

subcategory "Command."  *Id.*  Gillan's signature appears beneath the following statement: "I

acknowledge that I have seen this report.  I have been apprised of my performance and right to

make a statement."  *Id.*  Nevertheless, there is no evidence in the administrative record

---

[14]     The court notes that judicial review of decisions made pursuant to 10 U.S.C. §
1552(a) is extremely limited because "[i]t is simply more difficult to say that the Secretary has
acted arbitrarily if he is authorized to act '*when he considers it necessary* to correct an error or
remove an injustice,' 10 U.S.C. § 1552(a) (emphasis added), than it is if he is required to act
whenever a court determines that certain objective conditions are met, i.e. that there has been an
error or injustice." *Kreis v. Sec'y of the Air Force*, 866 F.2d 1508, 1514 (D.C. Cir. 1989).

indicating that Gillan ever submitted a statement to contest Jorgensen's evaluation, nor is there evidence that Gillan ever filed an administrative complaint against Jorgensen for the fitness report.  In December 1998, at Gillan's request, Jorgensen submitted a memorandum to the Naval Bureau of Personnel entitled "Supplemental Fitness Report."  A.R. 288.  It states the following: "Block 57 change from 'B' to 'A'.  Information received after report was written justifies a higher grade: specifically volunteered for Desert Storm.  Outstanding command of his Maintenance Division."  *Id.*   Jorgensen did not specify when the new information was received or why it took him eight years to submit the supplementary report.

In its response to Gillan's first request that the Board implement a change to his fitness report, the Board stated that "[a]fter careful and conscientious consideration of the entire record, the Board found that the evidence submitted was insufficient to establish the existence of probable material error or injustice."  *Id.* at 276.  The decision went on to say that the Board "found [Gillan's] chances for promotion would not have been appreciably enhanced, had [his] fitness report for 20 January to 30 September 1990 reflected an 'A' in block 57 (desirability for command), as shown in the reporting senior's letter of 1 December 1998, rather than 'B', as in the original."  *Id.*  When another full board convened to re-consider Gillan's claim, it also denied his request to amend the fitness report, finding that the "reporting senior's letter, some eight years after the fact, does not persuade the Board that a change was warranted."[15]  *Id.* at 574.    Giving all due deference to the Board, the court cannot conclude that its decision not to

---

[15]    While the Board ultimately decided not to amend Gillan's fitness report, it did note that he could request the letter to be filed in his record along with the fitness report. A.R. 574.

amend Gillan's fitness report was arbitrary and capricious.[16]  The Navy regulations clearly state

that a reporting officer must make changes to a fitness report within two years of the ending date

of the report, and it is undisputed that Jorgensen did not submit his supplemental report until

eight years had passed.  It is not at all evident that the eight year delay was due to circumstances

beyond Jorgensen's control, as it must be to justify late submission. BUPERINST 1610.10,

Annex P, ¶ P-4(c).  The Board's comment that the supplemental material came eight years after

the ending date of the fitness report is certainly "rationally connected" to the fact that the

regulations were violated.  *Dickson,* 68 F.3d at 1404.  That Jorgensen violated the applicable

regulations in submitting his supplementary report is a viable reason for declining to amend the

fitness report, and Gillan's failure to contest the report further supports the Board's decision.

### III. CONCLUSION

For the foregoing reasons, the Navy's motion to dismiss, or in the alternative, for

summary judgment (Dkt. #3) is granted, and Gillan's cross-motion for summary judgment (Dkt.

#9) is denied.  An appropriate order accompanies this memorandum.


Henry H. Kennedy, Jr.
United States District Judge

Dated: November 1, 2005

---

[16]     The Board's decision not to amend Gillan's fitness report need only contain "a
rational connection between the facts found and the choice made" to show that it was not
arbitrary and capricious.  *Dickson v. Sec'y of Defense,* 68 F.3d 1396, 1404 (D.C. Cir. 1995).
While the Navy must present some explanation for denying an application, *Kreis*, 866 F.2d at
1514–15, "a court is not to substitute its judgment for that of the agency."  *Motor Vehicles Mfrs.
Ass'n v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 43 (1983).